UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY HOXIE,

        Plaintiff,

vs.

Case No. 09-CV-10725

HON. GEORGE CARAM STEEH

LIVINGSTON COUNTY, et al,

        Defendants.
_____/

ORDER GRANTING DEFENDANT SIMPSON'S MOTION FOR
SUMMARY JUDGMENT [DOC. 162], GRANTING IN PART AND DENYING
IN PART THE LIVINGSTON COUNTY DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT [DOC. 166], AND DENYING PLAINTIFF'S
<u>MOTION FOR CONTEMPT AND DEFAULT [DOC. 182]</u>

      This matter comes before the court on defendant Sheryl Simpson's motion for summary judgment [Doc. 162], the Livingston County defendants' motion for summary judgment [Doc. 166], and plaintiff Gregory Hoxie's motion for contempt and renewed request for default of the Livingston County defendants [Doc. 182]. The court heard oral argument on these motions on April 25, 2011.

<u>PROCEDURAL BACKGROUND</u>

      The court previously heard Simpson's motion to dismiss, which it granted in part and denied in part in its August 6, 2010 Order. The court held that Simpson did not have actual knowledge of the extent of plaintiff's head injury until March 21, 2006 when she saw him and referred him to an outside facility for treatment. After plaintiff's surgery on March 31, 2006, plaintiff complained of a worsening of his symptoms and alleges that by prescribing only nasal spray and Motrin, Simpson disregarded his serious

medical needs. The court held that plaintiff alleged sufficient facts in his Amended Complaint to state a deliberate indifference claim against Simpson due to her lack of follow-up care after his March 31, 2006 surgery until his discharge from the jail on May 23, 2006.

What the court dismissed from plaintiff's complaint with regard to Simpson was his allegations of deliberate indifference of his medical needs pertaining to the intake process, any pre-assault medical care, and medical care from the date of the assault to the date of surgery. The parties conducted additional discovery and Simpson has now filed a motion for summary judgment.

On July 9, 2009, the court granted the Livingston County defendants' motion for judgment on the pleadings, dismissing with prejudice plaintiff's state law claims on the basis of expiration of the statute of limitations and/or governmental immunity. The order also dismissed plaintiff's claims of violation of constitutional rights for failure to state a claim upon which relief can be granted. Plaintiff filed an amended complaint on July 31, 2009 alleging four violations of civil and constitutional rights, and adding several individual defendants. Defendants filed a renewed motion for judgment on the pleadings, which the court granted in part and denied in part in its Order of August 6, 2010. Specifically, the court held defendants were not deliberately indifferent to plaintiff's medical needs before the assault by Backus. The court also dismissed defendants Miks and Young from the case.

The amended complaint alleges the following four counts against the Livingston County defendants:

    I. Unconstitutional policy and practice of defendants Livingston County, Sheriff

Bob Bezotte, Undersheriff Murphy, and Jail Administrator Cremonte - failure to train officers to properly classify and segregate inmates.

II. Deliberate indifference of defendants Cremonte, Otten, Cortez, York, Howe, Boyer, Jackson, Davis, Daniels and Barry - failure to classify and segregate inmates.

III. Unconstitutional policy and practice of defendants Livingston County, Bezotte, Murphy and Cremonte - failure to train officers and staff to provide adequate medical care for inmates and/or adoption of policy not to provide substantial medical care for inmates with serious medical needs.

IV. Deliberate indifference to the adequate provision of medical care to plaintiff by Cremonte, Otten, Cortez, York, Howe, Boyer, Jackson, Davis and Barry.

The Livingston County defendants move for summary judgment on the entire complaint.

## DISCOVERY ISSUE

Plaintiff filed a motion for contempt, along with a renewed request for default of the Livingston County defendants, based on his contention that the Livingston County defendants have wilfully refused to comply with discovery requesting cell assignments by date. This issue has been before Magistrate Judge Majzoub and this court numerous times throughout the pendency of this case. Defendants still maintain that they are not able to generate cell assignments by date for the time period at issue in this case.

The court is convinced that defendants could generate the information sought by plaintiff if the parties worked together to come up with a list of inmates who were in the jail at the relevant times. This is not to say that the effort required to reverse-engineer

3

the discovery response would not be arduous, just that it would not require the Herculean effort described by defendants.

There has been a clear lack of cooperation between the parties in this case, and for this the parties must share responsibility. The court finds that under the circumstances sanctions are not warranted. Plaintiff's motion for contempt and default is DENIED.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.

574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

## ANALYSIS

### I. Dr. Simpson's Motion for Summary Judgment

#### A. Deliberate Indifference to a Serious Medical Need

To succeed on a claim of deliberate indifference to a serious medical need, plaintiff must satisfy two elements: (1) that he objectively had a serious medical need; and (2) that defendant, being aware of that need, acted with deliberate indifference to it. Wilson v. Seiter, 501 U.S. 294, 300 (1991). Deliberate indifference requires more than mere negligence and less than actual intent. See Farmer v. Brennan, 511 U.S. 825,

5

836-37 (1994); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). Defendant Simpson would have had to have recognized a risk to plaintiff's health and disregarded it in order to be liable under a claim of deliberate indifference to a serious medical need.

    1. March 31, 2006 to May 23, 2006

Looking at the period March 31, 2006 through May 23, 2006, plaintiff presented to defendant Simpson for treatment on only one occasion. On April 27, 2006, plaintiff saw Simpson, who noted his complaints of stomach pain, dizziness, and ringing in his ears. Simpson prescribed saline nasal spray, Sudafed, Zantac, and Antivert to treat these symptoms, which are consistent with a sinus condition as well as a traumatic brain injury.

The issue for deliberate indifference is not whether Simpson turned out to be wrong in her diagnosis or treatment of plaintiff. That would amount to a medical malpractice standard. Deliberate indifference requires, in addition to being aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, a subjective showing that the defendant was aware of a risk of harm to the plaintiff. There is no objective evidence that plaintiff suffered from a closed head injury.

Dr. Sherick, a plastic surgeon, testified that Dr. Simpson's treatment of plaintiff was appropriate for the symptoms presented. (Sherick dep. 15-16). Correctional medicine expert Dean Rieger, M.D. opined in his expert report that Dr. Simpson generally treated plaintiff appropriately. (Rieger Expert Report, p. 21). Plaintiff does not submit any expert testimony on this issue. In fact, there is no evidence in the record that plaintiff suffered from a traumatic brain injury while he was incarcerated in Livingston County.

6

Plaintiff does submit two neuropsychological evaluations conducted after Hoxie was released from jail. Dr. Jacobus Donders evaluated plaintiff on September 12, 2006, and opined that he had psychosis with prominent elements of paranoid thoughts, such that he was not capable of making informed decisions about his care. Dr. Donders stated that his psychosis was not likely to be attributable to a brain injury. Dr. Donders recommended guardianship by a third person. (Response to defendants' prior 12(b)(6) motion, doc. 42). Dr. Glen Johnson evaluated plaintiff more than three years after his release from jail, on September 23 and 28, 2009, and opined that he displayed symptoms that are common indicators of a head injury. Dr. Johnson further opined that plaintiff's brain injury may have exacerbated pre-existing psychiatric features into the realm of a psychotic disorder. (Response to defendants' prior 12(b)(6) motion, doc. 42). Neither of these neuropsychological evaluations support a conclusion that plaintiff in fact suffered a traumatic brain injury while he was in the Livingston County Jail.

Aside from Dr. Simpson's treatment of plaintiff on April 27, jail nursing staff consulted Dr. Simpson on two other occasions to order medication for plaintiff. On April 7, 2006, nursing staff consulted with Simpson to approve an order for additional pain medication for plaintiff because he was having breakthrough pain between his doses of Vicodin, the painkiller prescribed by Dr. Sherick following plaintiff's surgery. Dr. Simpson approved Motrin 600mg on April 7, 2006. Dr. Sherick testified that Motrin 600mg was appropriate for this purpose. (Sherick dep. 13).

On May 2, 2006, nursing staff consulted Simpson to prescribe medication because plaintiff was complaining of sinus pressure and headache. Simpson approved

Sudafed and Advil to treat these ailments. Sherick testified that those medications are appropriate to treat those symptoms. (Sherick dep. 16-17).

Dr. Simpson may have referred plaintiff to see Dr. Sherick again, based on her notes from April 27 that plaintiff continued to complain of blurred vision, dizziness and tightness. Dr. Sherick saw plaintiff on May 19, 2006 and referred him to see a physical medicine doctor due to his complaints of pain. Plaintiff was released from jail on May 23, 2006, without having any further medical appointments.

After his discharge from jail, on May 26, 2006, plaintiff went to the emergency room at Munson Medical Center in Traverse City. Dr. Eric VanderHaagen, D.O. was the emergency room physician who treated plaintiff. A CT scan was done of plaintiff's brain, which revealed nothing wrong. Dr. VanderHaagen testified that when he examined plaintiff on May 26, there were no *objective* indications that plaintiff was in need of any follow-up treatment for his head injury. (VanderHaagen dep., pp. 32-33). Based on his self-report that he believed he had suffered a seizure, plaintiff was discharged with instructions to follow up with Dr. Wilcox, his family physician, and a prescription for an EEG, which was done a week later and was normal.

Plaintiff contends that his three neurology experts support his claim that Simpson's failure to treat him for a traumatic brain injury actually exacerbated his condition. However, plaintiff was forced to agree at oral argument that during his confinement at the Livingston County jail, there were no symptoms of a traumatic brain injury noted. As admitted by counsel, plaintiff did not suffer any seizures or display stuttering during his confinement.

There is no evidence to support a deliberate indifference claim against Dr.

Simpson for the time period at issue. For this reason, defendant Simpson's motion for summary judgment is GRANTED.

2. Pre-March 31, 2006

Plaintiff attempts to renew his claims against Simpson that are outside the period clearly defined by the court in its August 6, 2010 order. First, plaintiff alleges Simpson knew plaintiff had a medical condition upon intake to the jail but never obtained the Kentucky medical records and did not treat plaintiff for this injury until after the assault that took place at the jail seven months later. The Kentucky records, which have now been obtained, show that plaintiff was involved in a fight, but a CT scan revealed nothing wrong and plaintiff was discharged from the hospital the same day. Contrary to plaintiff's argument, these records do not disclose evidence of a brain injury, or any injury, that required follow-up care. Plaintiff identifies no evidence to cause the court to reconsider its decision on this issue.

Next, plaintiff alleges that a nurse saw plaintiff immediately after the assault on March 18, 2006, and the nurse called Simpson at home for direction on how to treat him. Plaintiff takes issue with Simpson's treatment on that day, which was to prescribe Motion 600 mg twice a day. The evidence shows that plaintiff was punched in the face just below his left eye, suffered a cut to his left eye, displayed swelling, and complained of blurred vision in his left eye. Plaintiff did not lose consciousness and was able to coherently describe his symptoms to medical personnel. Simpson's treatment of plaintiff on March 18 cannot be said to be deliberately indifferent. Plaintiff also questions that Motrin 600 mg was even administered prior to March 20. The court has not been presented with any reason to question the records showing Dr. Simpson did

9

prescribe Motrin 600 mg twice a day beginning on March 18, and that such medication was administered to plaintiff starting on that date.

Dr. Simpson examined plaintiff on March 21, 2006, three days after he was assaulted. Simpson could not feel plaintiff's cheekbone due to swelling and she attempted to check his ears for hymotympanum but was unable to do so because the jail's otoscope was not working properly. Simpson noted that plaintiff had a possible blowout fracture and ordered that he be transported to the emergency room for further treatment.

Plaintiff relies on a Seventh Circuit case, Murphy v. Walker, 51 F.3d 714 (7th Cir. 1995), for the proposition that an injury to the head inflicting prolonged pain and discomfort mandates medical evaluation within a reasonable period of time. The Murphy court was "of the opinion that injuries of the cranial cavity can and should be treated within a matter of minutes or hours rather than after several days, weeks, or months." Id. at 720 fn.12.

The Sixth Circuit has held that when an inmate complains about a delay in medical treatment in an Eighth Amendment situation, the inmate must have corroborative medical evidence in the record to demonstrate the detrimental effect of the delay in medical treatment. Napier v. Madison County, Ky, 238 F.3d 739, 742-43 (6th Cir. 2001). However, as plaintiff correctly points out, Napier was modified in part by Blackmore v. Kalamazoo County, 390 F.3d 890 (6th Cir. 2004), which held that "verifying medical evidence" is relevant to those claims involving minor maladies or non-obvious complaints of a serious need for medical care. "Napier does not apply to medical care claims where facts show an obvious need for medical care that laymen

would readily discern as requiring prompt medical attention by competent health care providers." Id. at 898.

Once Dr. Simpson saw plaintiff, she sent him immediately to the emergency room for medical treatment. There is no evidence that Dr. Simpson had reason to believe plaintiff needed a referral for medical treatment before she examined him on March 21. Nor is there evidence that plaintiff *actually* needed more care than he received prior to March 21. Simpson's prescription for Motrin 600 mg was appropriate for the swelling and pain described to her by the nurse. Furthermore, Dr. Sherick testified that it is standard for him to see patients like Hoxie within two weeks of sustaining an injury. In fact, Dr. Sherick could not perform the corrective surgery on Hoxie until the swelling subsided, almost two weeks after the assault.

Plaintiff has failed to present any evidence or argument compelling the court to resurrect plaintiff's pre-surgery claims against Dr. Simpson. Furthermore, Dr. Simpson's motion for summary judgment as to the claims that did survive the motion to dismiss is GRANTED in its entirety.

**2. Livingston County Defendants' Motion for Summary Judgment [166]**

    A. Failure to Train on Classification and Segregation Policies

Municipal liability under 42 U.S.C. 1983 can be imposed only if the injuries are inflicted pursuant to the municipality's policy or custom. Monell v. New York City Department of Social Services, 436 U.S. 658, 694 (1978). The policy must be "the moving force of the constitutional violation." Id. at 694. The plaintiff must identify the policy, connect the policy to the county itself and show that the particular injury was incurred because of the execution of that policy. See Garner v. Memphis Police Dept.,

8 F.3d 358, 364 (6th Cir. 1993).  A municipality can be held liable for inadequate training under § 1983 only where the failure to train amounts to deliberate indifference to the rights of persons with whom its officers come into contact.  City of Canton v. Harris, 489 U.S. 378, 388 (1989).  The failure to train must reflect the deliberate or conscious choice by a municipality.  Id. at 389.  Claims against a government officer in his or her official capacity are deemed claims against the governmental entity.  Kentucky v. Graham, 473 U.S. 159, 165-66 (1985).

Livingston County and the Sheriff had in place both written policies and practices for training corrections officers with respect to classification and segregation.  Exhibit 6 is a copy of the Livingston County Sheriff Department Procedure Number 9.3 Corrections Officers Training Program.  Exhibit 9 is a copy of the Livingston County Sheriff Department Procedure Number 14.16 regarding classification of inmates, effective in 1996.  The procedure lists eight possible classifications from Level 1 Maximum High to Level 8 Minimum very low, based on the risk to security inmates present.  There is also a process for review of classification, either automatically or by request.

Defendant Daniels is a classification officer who underwent training under the department policy.  The Jail uses the Northpointe system of classification, and Daniels attended a one day training session at the Northpointe school.  (Daniels' dep. 18).  Daniels was asked about events that would trigger a reclassification of an inmate.  With regard to an inmate who assaults another inmate, Daniels testified that reclassification would only occur if a weapon were used.  (Daniels dep., 24).  Daniels also testified about a "keep separate" list that is maintained at the Jail.  (Id., 39).  This is a list of

12

inmates who are to be kept separate from one another for various reasons, including fighting. The "keep separate" list is not the subject of a formal written procedure, but it is a practice used by the department to protect inmates from risk of harm from other inmates. (Id.). Daniels explained that it was his job to classify inmates initially, but he would not be notified of disciplinary action because it was not his job to reclassify inmates. (Id., 47).

Defendant Boyer was involved in classification of inmates in 2006. (Boyer dep., 19). He testified that inmates automatically came up for reclassification after spending a certain number of days in the Jail, and they would also come up for reclassification if they had been disciplined. (Id., 20). Boyer explained that in looking at discipline for purposes of reclassification, the officer would only look at incidents from the inmate's current stay. (Id., 21-22).

Defendant Hoffman was the corrections officer who took down the report from Hoxie on February 16, 2006, regarding inmate Hunt. Hoffman testified that he did not receive any training regarding the protection of inmates who snitched or informed on other inmates. (Hoffman dep., 26-27). Hoffman stated that protecting inmates who snitched was not in his job description. (Id.).

The Corrections Officers' Training Program at the Jail required officers to follow other corrections officers around for four weeks. There is no evidence the officers involved in the classification and segregation of inmates at the Jail were actually trained regarding established indicators that an inmate-on-inmate assault is imminent. While the County's policy at Exhibit 9 dictates reclassification should be done "periodically, or as a result of disciplinary action, at sentencing, new offense or other pertinent

information," the evidence would tend to show that in practice there was no training on this policy. Nor was there an understanding of the policy by the corrections officers. As indicated above, the officers testified that reclassification was only warranted if disciplinary action was for a sufficiently violent offense. Only information from an inmate's current term in Jail was to be considered, and there was no policy on reporting safety concerns for particular inmates due, for example, to snitching on another inmate.

Clearly, there is a heightened potential for violence among inmates in a jail setting. It is the responsibility of the County to train its officers regarding issues like the classification and reclassification of inmates, and protecting inmates from violence at the hands of other inmates. The apparent failure of Livingston County to train its corrections officers in adequately classifying, reclassifying and protecting inmates could amount to deliberate indifference to the rights of inmates like plaintiff. This failure is supported by the testimony of the defendant corrections officers themselves. At this point, a reasonable fact finder can conclude that the assault inflicted upon plaintiff by inmate Backus would not have occurred if not for a failure of the County to provide a clear and appropriate policy regarding classification and protection of inmates, and training of its officers in said policy.

Defendant Livingston County's motion for summary judgment on plaintiff's Monell claim is DENIED. The Sheriff, Undersheriff and County Administrator were named in their official capacities, so the claims against them are deemed to be claims against Livingston County. See Kentucky v. Graham, supra 473 U.S. at 165-66.

B. <u>Deliberate Indifference of Cremonte, Otten, Cortez, York, Howe, Boyer, Jackson, Davis, Daniels and Barry Regarding their Alleged Failure to Classify Inmates</u>

Prison staff must "take reasonable measures to guarantee the safety of the inmates" in their care. <u>Hudson v. Palmer</u>, 468 U.S. 517, 526-27 (1984). Daniels performed the classification of Hoxie on August 27, 2005 and Backus on February 2, 2006. Daniels had to override the automatic classification for inmate Backus to put him at a higher level of risk/security. (Daniels dep. 73). Daniels testified that he did not have responsibility for reclassification of inmates. Defendant Boyer testified that he did do classifications in 2006, but he did not classify Backus or Hoxie.

Plaintiff relies on an incident in which he told Defendant Hoffman that another inmate, Hunt, falsely reported an incident in the jail in order to get money from the county or an early release from jail. (Exhibit 14, Incident Report of 2/14/06). Plaintiff claims this caused him to be branded a "snitch", and therefore susceptible to assault by other inmates.

In support of his claim that the Livingston County defendants knew inmate Backus was out to get him, plaintiff submits the affidavits of inmates Swiontek and Hobbs. Swiontek and Hobbs both aver that in the days before Backus assaulted Hoxie, Backus screamed from his cell that Hoxie was a snitch, and generally threatened to get Hoxie. The facts demonstrate that Backus was in confinement until two days before his assault on Hoxie. Backus and Hoxie were both housed in Tier 127 just before the assault. If Backus really did shout out his threats to get Backus for being a snitch, the inmate affiants opine that any corrections officer on the floor would have been in a position to hear the threats.

15

The lack of a policy on reporting threats, and the lack of specific training on what to do if a corrections officer is aware that an inmate has threatened another inmate, would be a glaring failure on the part of the County.  Taking the affidavits submitted in the light most favorable to Hoxie, either some corrections officers knew about the threats and passed them along to their superiors and nothing was done in response, or the corrections officers did not report the threat to anybody.  This demonstrates a failure of training.  However, plaintiff has not shown that any of the individually named defendants was specifically aware of any threat made by Backus against Hoxie.

Plaintiff's only other argument in this regard is that Hoxie's missing statement to Hoffman, which had been attached to Incident No. 182-06, is entitled to the reasonable inference that Hoxie snitched on Backus as well as inmate Hunt.  This statement allegedly put defendants on notice that Hoxie required protection from Backus.  Plaintiff argues that because the County lacked any written policies concerning the protection of inmates from each other, defendant Hoffman failed to offer Hoxie protection when Backus got out of lockdown and sought Hoxie out for snitching.

The evidence does not support a negative inference instruction, as requested by plaintiff.  Hoxie himself testified that he never snitched on Backus.  Hoffman's incident report discusses information provided by Hoxie about Hunt, but does not mention Backus at all.  There is no reason to believe that the missing written statement contained information about Backus.

When Hoxie returned to Jail on March 21, 2006, after his visit to the hospital following the assault, other inmates reported that they believed Hoxie would be assaulted again because he "was rumored to be responsible for giving information to

16

officers regarding inmate Backus' pending cases." (Exhibit 15, Incident Report of 3/21/06). At this time "the decision was made to move inmate Hoxie to a dorm unit and placed inmate on the keep separate list from upper Tier 127 and inmate Backus." (Exhibit 15).

When all of the evidence is viewed in the light most favorable to plaintiff, a reasonable fact finder does not have enough evidence to conclude that the individually named defendants knew Backus was out to get him prior to the assault of March 18, 2006. For this reason, the deliberate indifference claim against the individual defendants fails, and summary judgment is GRANTED in favor of the defendants.

    C.   <u>Medical Care Policy - Failure to Train and Deliberate Indifference</u>

Defendants Livingston County, Sheriff, Undersheriff and Jail Administrator adopted a specific policy with respect to medical care of inmates. (Livingston County Sheriff Department Procedure Number 15.1, Exhibit 16). The overriding policy of the County with regard to incarcerated individuals is that: "Any and all persons injured in an incident will receive immediate medical examination and treatment." In 2006, the County had a contracted medical provider, Health Professionals LTD, which placed nursing staff and Dr. Simpson at the Jail. Corrections officers are only required to have medical training in first aid and CPR. Under the policy, corrections officers are prohibited from making medical decisions, but are charged with calling the jail physician or nurse for any non-emergency situation that causes them concern. The Michigan Department of Corrections inspected the Livingston County Jail's rules and regulations on medical care of inmates and found that they fully complied with MDOC regulations in 2005 and 2006.

Plaintiff argues there is a genuine issue of material fact as to Livingston County's deliberate indifference in prohibiting their corrections officers from making medical decisions concerning inmates.  The policy does permit corrections officers to provide first aid to inmates, and actually requires that they maintain current certification in basic first aid and CPR.  The policy then divides medical needs into three categories.  First, an inmate can request to see the jail nurse or physician, who must be available, as determined by contract, to take care of such medical requests.  Second, in the event of an emergency, an inmate is to be transported to the hospital.  The policy does not limit who can make the determination of the existence of an emergency.  Finally, in the event of a non-emergency situation that causes concern to a corrections officer, the jail physician or nurse shall be called.  So, while "all medical, psychiatric, and dental inmate matters involving medical decisions" are the "sole province of the responsible physician, dentist or other qualified health care professional", the Jail staff does play a role in helping inmates obtain medical treatment. This role ranges from providing basic first aid, to obtaining medical help for an inmate in an emergency or non-emergency situation.

The evidence in this case shows that the defendant deputies obtained immediate medical care for plaintiff after the assault.  Defendants Otten, Cortez and York took plaintiff immediately to the medical clinic where he was seen by a nurse.  Surely plaintiff is not arguing that the corrections officers should be trained to provide medical treatment in this instance.  The only thing before the court is attorney argument that because plaintiff had swelling on his face and blurred vision in the days between the assault and seeing Dr. Simpson, defendant corrections officers should have sent plaintiff to the emergency room.  However, the evidence does not support a finding of

deliberate indifference.

The nurse conversed with Dr. Simpson by telephone and administered Motrin at the order of Dr. Simpson.  When Dr. Simpson examined plaintiff on March 21, 2006, she sent him to the emergency room at St. Joseph Mercy Hospital.  Plaintiff was seen by Dr. Robert Fields, a board certified specialist in emergency room medicine.  Dr. Fields testified that it was reasonable for the jail personnel to wait for Dr. Simpson to come to the jail and evaluate plaintiff on March 21, 2006.  (Fields dep., 32-34).

Plaintiff saw Dr. Sherick on March 24, and was scheduled for surgery on March 31.  Dr. Sherick testified that he had no concerns about the care plaintiff received at the Jail.  He explained that facial fractures are typically dealt with within two weeks, and nasal fractures can even go a big longer before they are taken care of.  Dr. Sherick stated that there were no complications due to the fact that the injury occurred on March 18 and the surgery was performed on March 31.  (Sherick dep., 23-24).

After his surgery, plaintiff continued to receive follow-up care in the Jail and the jail medical staff continued to administer plaintiff's medications as prescribed by Drs. Sherick and Simpson.  There is no evidence that plaintiff complained to any of the named individual defendants.  The evidence shows that Livingston County had a specific policy for providing medical care to inmates, that jail personnel were to adhere to the physician's orders and the jail nurses were to carry those orders out.  There is no evidence of a failure to train the corrections officers in the policy, and in fact, there is evidence that the corrections officers immediately obtained medical care for plaintiff as they were required to do under the policy.

The Livingston County defendants' motion for summary judgment as to plaintiff's Monell claim against the County, Sheriff, Undersheriff and Jail Administrator regarding lack of a policy on providing medical care and failure to train, is GRANTED. Defendants' motion for summary judgment as to plaintiff's deliberate indifference claim against the individually named defendants is also GRANTED.

## CONCLUSION

For the reasons stated in this opinion and order, defendant Dr. Simpson's motion for summary judgment is GRANTED. The Livingston County defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART, with plaintiff's Monell claim against the County regarding classification and segregation of inmates being the only claim surviving summary judgment. Plaintiff's motion for contempt and renewed request for default of the Livingston County defendants is DENIED.

So ordered.

Dated: May 24, 2011

S/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
May 24, 2011, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk